UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL LOGAN,

                Plaintiff,

-against-

SAKS & COMPANY, LLC,

                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/2020

18 Civ. 9023 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, Daniel Logan, claims that his employer, Defendant, Saks & Company, LLC, violated his rights under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 *et seq.*; discriminated against him on the basis of his disability in violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin Code § 8-101 *et seq.*; and unlawfully retaliated against him for exercising his rights under the NYSHRL and NYCHRL. Compl. ¶ 1, ECF No. 1.

    Now before the Court is Defendant's motion for summary judgment on all claims. ECF No. 42. For the reasons that follow, the motion is GRANTED.

**BACKGROUND[1]**

    Defendant is a luxury department store with a flagship location in Manhattan. 56.1 Stmt. ¶¶ 1, 11, ECF No. 43. Plaintiff began working as a sales associate in the flagship's women's shoe department on July 22, 1991. 56.1 Stmt. ¶ 11. In 2004, he was diagnosed with rectal cancer and was treated with surgery that involved removing part of his rectum. *Id.* ¶ 128. As a result of the surgery, Plaintiff has the sensation of needing the bathroom within several minutes

---

[1] The following facts are drawn from the parties' pleadings and submissions, including the complaint and the parties' Rule 56.1 statements of undisputed fact and the response thereto. Facts in dispute are so noted. Citations to a paragraph in Defendants' Rule 56.1 Statement also include Plaintiff's response.

of eating, and it can take one to two hours for him to use the bathroom. *Id.* ¶¶ 131, 213–214. Because of his medical condition, Plaintiff would try to avoid eating during the workday, and would do so only if he got a headache from hunger. *Id.* ¶¶ 132–133, 215. On those occasions, he would have to go to the restroom, which could take up to two hours. *Id.* ¶ 133. He estimates that he felt the need to eat at work two to three times per month. *Id.* ¶ 134.

Defendant sets sales goals for its associates based on a formula taking into consideration factors including the associate's sales performance during the prior year, whether the associate took more than two weeks of leave in the preceding year, and whether the associate was expected to take more than two weeks of leave in the coming year. *Id.* ¶¶ 14–16. Sales goals are calculated on the assumption that every associate will miss at least two weeks of work, which is why only absences that exceed two weeks lead to a reduction. *Id.* ¶¶ 17, 244. In 2017, the baseline sales goal for an associate who did not miss more than two weeks of work was $780,000, derived by multiplying a $400 hourly goal by 37.5 hours per week. *Id.* ¶¶ 114–116.

Defendant also evaluates associates against a set of service standards, such as (1) creating a welcoming environment for customers as they enter the sales area and offering assistance; (2) asking customers appropriate questions to identify their needs; (3) providing dynamic service relying upon knowledge of the store layout, current merchandise and in-store services; and (4) demonstrating a high level of energy and the ability to multi-task in a fast-paced environment, and understand customers' concerns and needs. *Id.* ¶ 13.

Defendant annually assigns associates a rating based upon whether they met their sales goals and satisfied their service standards. *Id.* ¶ 18. In order to receive an "At Target" performance rating, a sales associate must have an overall rating of 50 out of 100. *Id.* ¶ 19. Associates' sales goals are rated from 30 to 60, based on the percentage of their sales goals they

satisfy, and their service standards are rated out of 40, based on ratings from zero to four in ten different categories—the overall rating is calculated by adding the two. *Id.* ¶¶ 19–24.

From 2010 through 2014, Plaintiff received an overall performance rating of "At Target." *Id.* ¶ 27. In 2014, Plaintiff achieved 88.8 percent of his sales goal, earning him 40 points, and a service standard rating of 19, totaling 59 points, an "At Target" rating. *Id.* ¶¶ 28–30. In 2015, Plaintiff's net sales goals were initially set to $1,002,109, but were reduced to $962,613 because Plaintiff took more than two weeks of leave authorized by the FMLA. *Id.* ¶ 31. The reduction was calculated by taking the number of hours Plaintiff missed on leave, and multiplying that by $400. *Id.* ¶¶ 32–33. In 2015, Plaintiff achieved 77.9 percent of his adjusted net sales goals, earning him 30 points, and a service standard rating of 18 points, leading to a "Below Target" rating of 48 points. *Id.* ¶¶ 35–37.

In 2016, Plaintiff's annual sales goal in 2016 was $875,000. *Id.* ¶ 62. In March 2016, Plaintiff's supervisor Daniel Kermani issued Plaintiff a "Performance Improvement Level I Warning" noting Plaintiff's Below Target rating for 2015 (the "Level I Warning"). *Id.* ¶ 40. In his conversation with Kermani about the Level I Warning, Plaintiff did not suggest that his performance was related to his medical condition, or request an accommodation going forward. *Id.* ¶¶ 44–45.

In November 2016, Plaintiff's supervisor Nicole DeMartino issued Plaintiff a "Performance Improvement Level II Warning" (the "Level II Warning"). *Id.* ¶ 46. The Level II Warning indicated that Plaintiff only achieved 50 percent of his sales goal for the 2016 spring season, and also noted that Plaintiff was not performing adequately in certain service standard areas, including asking questions of customers to uncover their current and future needs and desires, asking for and receiving client contact information, and consistently following up on

3

alterations and locator requests, and checking in with customers to try to assist them and introduce them to new products. *Id.* ¶¶ 47–51. Plaintiff did not ask DeMartino or anyone else for an accommodation after he received the Level II Warning, nor did he request an accommodation related to his performance deficiencies between March and November 2016. *Id.* ¶ 57. At the end of 2016, Plaintiff achieved 64.6 percent of his net sales goals, earning him 30 points, and a service standard rating of 15 points, for a "Below Target" total of 45 points. *Id.* ¶¶ 60–61.

In 2017, Plaintiff's sales goal was further reduced to $790,000. *Id.* ¶ 63. On June 21, 2017, Plaintiff's supervisor Kristin Quail issued Plaintiff a "Performance Improvement Final Warning" (the "Final Warning"). *Id.* ¶ 65. The Final Warning stated that Plaintiff's sales had not improved, and noted that Plaintiff failed to meet service standards for registering client information at least 75% of the time for each sale made and capturing clients' e-mail information at least 50% of the time for each sale made, and for adhering to work schedules and dependability standards. *Id.* ¶¶ 66–69. The Final Warning stated that Plaintiff was required to demonstrate immediate and sustained improvement. *Id.* ¶ 73. Plaintiff did not ask Quail or anyone else for an accommodation after he received the Final Warning. *Id.* ¶ 71.

On December 14, 2017, Quail issued a written notice to Plaintiff stating that his employment was being terminated as a result of his failure to improve his performance (the "Termination Notice"). *Id.* ¶ 81–82. The Termination Notice listed three main deficiencies to justify his firing: (1) Plaintiff's failure to meet goals related to collecting client data after sales, *id.* ¶¶ 83–87; (2) Plaintiff's failure to meet goals related to customers opening credit cards with Defendant, *id.* ¶¶ 89–93; and (3) Plaintiff's achievement of only 57 percent of his 2017 sales goal in the third quarter of 2017, *id.* ¶ 94.

4

Plaintiff filed a grievance with his union challenging his termination. *Id.* ¶¶ 98, 263. And, on October 2, 2018, Plaintiff initiated this action. ECF No. 1. The grievance was heard by an arbitrator, who ruled on October 31, 2018 that Plaintiff had been terminated without just and reasonable cause, as required by Plaintiff's union contract. *Id.* ¶ 265; *see* Arbitrator Decision, ECF No. 50-5.[2] Accordingly, the arbitrator ordered Plaintiff's reinstatement, along with lost wages and benefits from the date of termination to the date of reinstatement. 56.1 Stmt. ¶¶ 264–265; Arbitrator Decision at 13.

Plaintiff was reinstated on April 22, 2019. 56.1 Stmt. ¶ 171. When Plaintiff returned to work, his register number had been inactivated. *Id.* ¶¶ 175, 177; Draper Decl. ¶¶ 4–5, ECF No. 45. Plaintiff was required to execute new-hire paperwork upon reinstatement, something required of all reinstated employees. 56.1 Stmt. ¶¶ 175–176. On April 24, 2019, after Plaintiff had completed the paperwork, his register number was reactivated. *Id.* ¶ 177; Draper Decl. ¶¶ 5–9. For Plaintiff's first two days back at work, he was assigned to the stockroom rather than the sales floor. 56.1 Stmt. ¶ 173; Draper Decl. ¶ 10. He was also asked to attend training for new employees, although ultimately he was not required to do so given his long experience with Defendant. 56.1 Stmt. ¶¶ 167–169.

**DISCUSSION**

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Feingold v. New York,* 366

---

[2] Defendant objects to the consideration of the arbitrator's decision as hearsay. 56.1 Stmt. ¶ 265. But the decision is not inadmissible hearsay, because the Court is considering the arbitrator's decision only for the purpose of understanding what was said and to show the circumstances under which subsequent events occurred, not for the truth of the matters asserted. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014).

F.3d 138, 148 (2d Cir. 2004). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Material facts are those which, under governing law, may affect the outcome of a case. *Id.*

The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(a), (c); *Celotex,* 477 U.S. at 322–25; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). The movant may satisfy its burden by "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B). If the non-moving party has the burden of proof on specific issues, the movant may also satisfy its initial burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex,* 477 U.S. at 322–23; *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002). In deciding the motion, the court views the record in the light most favorable to the nonmoving party. *O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 61 (2d Cir. 2002).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of fact. *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by facts. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir. 2002). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (internal quotation marks omitted).

II.    FMLA Claims

The FMLA allows eligible employees to take up to twelve work weeks of unpaid leave per year for the purposes specified in the statute, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "FMLA claims come in at least two varieties: interference and retaliation," *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Id.* And an employee may bring a retaliation claim based on "actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Id.* Plaintiff asserts both types of claim. Compl. ¶¶ 47–70; Pl. Opp. at 10–14, ECF No. 49.

A. Interference

Plaintiff claims that Defendant interfered with his exercise of rights protected under the FMLA by penalizing him for absences during FMLA-protected leave. Pl. Opp. at 10–11. He claims that Defendant did so by failing to adjust his sales goals to account for his time out of work on FMLA leave, and by disciplining him based on absences and lack of dependability, which effectively required him to forego needed leave in order to improve his performance as measured by Defendant's metrics. *Id.* To establish an interference claim, a plaintiff must show

> (1) that he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that he was entitled to take leave under the FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA."

*Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted).

7

It is not disputed that Defendant did not adjust Plaintiff's sales goals to account for the fact that he took seven days of leave in both 2016 and 2017. 56.1 ¶¶ 205–207. Defendant does not adjust its employees' sales goals unless they take more than two weeks of approved leave, because the sales goals are calculated under the assumption that employees will take at least two weeks of paid time off. 56.1 Stmt. ¶¶ 17, 244; Quail Dep. Tr. at 63:6-12; 114:21–115:2, 172:13–20, ECF No. 44-5. In 2015, when Plaintiff did take more than two weeks of FMLA leave, his sales goals were reduced accordingly. 56.1 Stmt. ¶¶ 31, 108. Plaintiff has adduced no evidence which suggests that meeting his sales goals was unreasonably difficult in light of his seven days of FMLA leave in 2016 and 2017. Consequently, Plaintiff has not shown that he was penalized for taking FMLA leave.

Plaintiff also argues that his repeated discipline for failing to meet sales goals and his service standards interfered with his rights under the FMLA by discouraging him from taking further FMLA leave, because he felt he needed to be at work in order to improve his performance. Courts in the this circuit require a plaintiff relying on such a "discouragement theory" to offer evidence that he "tried to assert [his] FMLA rights and was thereafter discouraged from taking FMLA leave, unless the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009).

There is no evidence that Plaintiff sought to take additional FMLA leave. And Defendant's discipline of Plaintiff based on his unsatisfactory performance was not an actionable act of discouragement under the FMLA. Had Plaintiff taken additional leave, the undisputed evidence shows that his sales goals would have been reduced. 56.1 Stmt. ¶¶ 31–32, 108; Quail

8

Dep. Tr. at 103:11–21, 135:5–18; Christ Dep. Tr. at 62:25–63:14, ECF No. 44-4.  But Defendant had no obligation to refrain from calling Plaintiff out and disciplining him for poor performance that was unrelated to his FMLA leave, on the theory that doing so might have discouraged Plaintiff from taking leave in the future.  The "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave."  *Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2014)); *see also e.g.*, *Hockenjos v. Metro. Transp. Auth.*, No. 14 Civ. 1679, 2016 WL 2903269, at *9 (S.D.N.Y. May 18, 2016) ("Criticizing, even berating an employee's substantive job performance is not enough to assert a claim for interference under a discouragement theory."), *aff'd sub nom. Hockenjos v. MTA Metro-N. R.R.*, 695 F. App'x 15 (2d Cir. 2017).

Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA interference claim.

B.  Retaliation

Plaintiff also asserts a claim of retaliation under the FMLA based on Defendant's failure to adjust his sales goals in 2016 and 2017, and his performance warnings in those years building up to his termination.  Pl. Opp. at 11–14.  "To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal citations and quotation marks omitted).  "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the

9

defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).

Assuming, without deciding, that Plaintiff has produced evidence that can make out a prima facie case, Defendant is still entitled to summary judgment, because Defendant has come forward with non-retaliatory reasons for not adjusting Plaintiff's sales goals, for each of its disciplinary actions, and for ultimately firing him. Defendant identified specific failings in Plaintiff's customer interactions, collection of client data after sales, convincing customers to open credit cards, and sales figures. 56.1 Stmt. ¶¶ 40, 47–51, 66–69, 83–94. Plaintiff has not adduced any direct evidence that those reasons were pretextual, or any circumstantial evidence, such as "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Graziado*, 817 F.3d at 430; *see Cooper v. New York State Nurses Ass'n*, 847 F. Supp. 2d 437, 446 (E.D.N.Y. 2012) ("[T]he plaintiff may rely on evidence presented to establish the *prima facie* case, as well as additional evidence, which may include direct or circumstantial evidence of discrimination.").

Accordingly, Defendant's motion for summary judgment on Plaintiff's FMLA claim is GRANTED.

III.     NYSHRL and NYCHRL Disability Discrimination Claims[3]

The New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") both prohibit disability discrimination, including by a failure to

---

[3] Plaintiff's state law claims "form part of the same case or controversy" as his claims under the FMLA, and the Court accordingly has supplemental jurisdiction to consider them. 28 U.S.C. § 1367(a). The Court is dismissing the FMLA claims, but nonetheless concludes that "economy, convenience, fairness, and comity" are best served by exercising supplemental jurisdiction to rule on the state law claims as well, given the uncomplicated, settled law that applies, the extensive litigation that has already occurred before this Court, and the fact that no party has asked the Court to decline to exercise supplemental jurisdiction. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018) (internal quotation marks and citations omitted); 28 U.S.C. § 1367(c).

accommodate a known disability. N.Y. Exec. L. § 296(2); N.Y.C. Admin. Code § 8-107. Plaintiff asserts claims under both statutes. Compl. ¶¶ 71–81, 88–97.

    A. Discrimination

"To state a prima facie case of disability discrimination under the . . . NYSHRL, or NYCHRL, a plaintiff must show: (1) the employer is subject to the . . . NYSHRL, or NYCHRL; (2) he suffers from a disability within the meaning of the . . . NYSHRL, or NYCHRL; (3) he is otherwise qualified to perform his job; and (4) he suffered an adverse employment decision because of his disability." *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 405–06 (S.D.N.Y. 2007) (collecting cases). "To prevail on an NYCHRL discrimination claim, 'the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.'" *Reed v. Nike, Inc.*, No. 17 Civ. 7575, 2019 WL 2327519, at *1 (S.D.N.Y. May 31, 2019) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013)).

Plaintiff claims that Defendant discriminated against him by disciplining and ultimately firing him for poor performance that was caused by his disability. He argues that his performance suffered because he was obligated to miss work due to his medical condition, as well as to arrive to work late and miss time on the sales floor, and that there were also occasions when he would get headaches from not eating all day and would have to eat something and then spend significant time in the restroom. Pl. Opp. at 17.

Defendant argues that it was not aware that Plaintiff's disability required further accommodation. The undisputed evidence supports that contention. In 2010, Plaintiff told one of his managers, Hannah Held, of "my medical condition, my medical history," but he could not recall the details of their conversation. Logan Dep. Tr. at 250:15–251:11, ECF No. 44-3. He

11

also testified that because he was coming into work late as a result of his condition, another manager, John Falci told him at some point between 2004 and 2013 that he should sign up for FMLA leave to protect his job. *Id.* at 23:16–23. Quail testified that she was informed when she began supervising Plaintiff that he was assigned the early shift and not the late shift as an accommodation, and that he had cancer years earlier. Quail Dep. Tr. at 40:13–20. Beyond those conversations, Plaintiff points to the fact that he often came to work late or missed work, that Defendant was notified when he was taking FMLA leave, and that he was receiving an accommodation, as evidence that Defendant was on notice of his disability. Pl. Opp. at 16.

But there is no evidence in the record that Defendant knew or should have known that Plaintiff's disability was causing the performance problems that led to his discipline and termination. In the multiple disciplinary conversations Plaintiff had with supervisors, he never raised his condition, or asked for an accommodation. 56.1 Stmt. ¶¶ 44–45, 57, 71. Indeed, he admits that he never asked anyone at Saks to lower his sales goals. *Id.* ¶ 111; Logan Dep. Tr. at 111:3–6. Plaintiff testified that he never spoke with anyone about his bathroom use and how it was affecting his work performance, Logan Dep. Tr. at 90:18–24, and concedes that he did not share with any managers how much time he was spending in the restroom or that his use of it was related to his prior cancer or any other medical condition, 56.1 Stmt. ¶¶ 137–139.

Accordingly, Plaintiff has failed to make out a prima facie case of disability discrimination under the NYSHRL or NYCHRL.

B. Accommodation

To assert an NYSHRL accommodation claim, "an employee must show that: (1) he is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the employee] could perform

12

the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (internal quotation marks and citation omitted). "The NYCHRL similarly 'requires that an employer make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job provided that the disability is known or should have been known by the employer.'" *Lazzari v. New York City Dep't of Parks & Recreation*, 751 F. App'x 100, 102 (2d Cir. 2018) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 998 N.E.2d 1050, 1053 (N.Y. 2013)) (internal quotation marks, citation, and alteration omitted).

Again, Plaintiff has not adduced evidence that could show that Defendant knew, or should have known, that he needed further accommodation of his disability. Plaintiff cannot prevail on a claim that Defendant should have accommodated his disability, or begun a process of developing an appropriate accommodation, if Defendant had no knowledge that Plaintiff had a disability requiring accommodation. *See Whitehurst v. Staten Island Univ. Hosp.*, No. 18 Civ. 1090, 2018 WL 2744710, at *6 (E.D.N.Y. June 6, 2018) ("[P]laintiff . . . can have no claim of disability-based discrimination as to her firing because [the defendant] did not know of her disability at that time."), *aff'd sub nom. Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201 (2d Cir. 2019).

Accordingly, Defendant's motion for summary judgment on Plaintiff's NYSHRL and NYCHRL disability discrimination claims is GRANTED.

IV.     NYSHRL and NYCHRL Retaliation Claims

Finally, Plaintiff claims that upon his reinstatement Defendant retaliated against him for filing this lawsuit by requiring him to work in the stockroom for his first two days back on the

13

job, fill out new-hire paperwork, and attend training—although, ultimately, he was told that there was no need for him to participate in the training.[4]  Pl. Opp. at 20–21.

As with other employment claims, NYSHRL and NYCHRL retaliation claims are evaluated under a three-step burden shifting framework.  "The initial step of this familiar framework requires the plaintiff to establish a *prima facie* case of retaliation.  The burden then shifts to the defendant to articulate a legitimate, non-retaliatory rationale for its employment decision.  If the defendant articulates a non-retaliatory rationale for its employment decision, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is a pretext for unlawful retaliation."  *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 383–84 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).  "To establish a *prima facie* case of retaliation under the NYSHRL, as under federal employment anti-discrimination law, a plaintiff-employee must show that (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action."  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361–62 (S.D.N.Y. 2012).  "Under the NYCHRL[,] the elements of retaliation are identical except that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity."  *White*, 973 F. Supp. 2d at 384 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

---

[4] To the extent Plaintiff's complaint asserts a claim for NYSHRL or NYCHRL retaliation prior to the filing of this action, his failure to contest Defendant's motion for summary judgment on that issue constitutes abandonment of it. Def. Mem. at 25–26, ECF No. 47; Pl. Opp. at 20–21; *see Garcia v. Jackson Hurst Partners LLC*, No. 18 Civ. 3680, 2018 WL 4922913, at *2 (E.D.N.Y. Oct. 10, 2018) ("[W]hen a defendant moves for dismissal or summary judgment and the plaintiff fails to address a particular claim in their opposition papers, it may be inferred that the plaintiff has chosen to abandon that claim.").

Defendant has put forward legitimate reasons for all of the actions Plaintiff claims were retaliatory, and Plaintiff has not pointed to any evidence showing that those reasons are pretextual.  It is not disputed that Defendant requires all employees who are reinstated to complete new-hire paperwork.  56.1 Stmt. ¶ 176.  The human resources manager of Defendant's flagship store explains in a declaration that Plaintiff was terminated from their computer system when he was fired, and so he was required to fill out new-hire paperwork to activate his register number.  Draper Decl. ¶¶ 4–6.  Plaintiff completed that paperwork on his second day after reinstatement, and his register number was activated on his third day.  *Id.* ¶¶ 6–9.  It is also not disputed that Defendant requires all new and returning sales associates to work in the stockroom to familiarize themselves with where shoes are located there.  56.1 Stmt. ¶ 172; Draper Decl. ¶ 11.  Nonetheless, Plaintiff disputes that he was required to work in the stockroom for that reason, rather than as retaliation.  He testified that he was generally familiar with the stockroom—although he admitted that there had been changes to its layout—and said that he was asked to work in the stockroom as follows:

> Well, the first day I got there, I went upstairs and Sherry told me — Sherry apologized and told me that my associate number wasn't activated yet so she said if I would mind doing stock work for the first day, so she put me downstairs and introduced me to a new director name Jessica. Jessica told Sherry that all new-hires do two days of stock work. I said to Sherry that I'm not a new-hiree. She goes, "Danny, do me a favor. Can you do two days of stock work?" So I was happy to have my job and I took it. I did it.

Logan Dep. Tr. at 85:16–86:6.  That description of events does not suggest that Defendant's explanation that it was standard to have returning employees work in the stockroom for a few days was pretextual, and it certainly does not indicate any retaliatory motive on Defendant's part.  At most, it suggests that the short delay in activating Plaintiff's register number was also a reason Plaintiff was asked to do two days of stockroom work.

15

Accordingly, Defendant's motion for summary judgment on Plaintiff's NYSHRL and NYCHRL retaliation claims is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate the motion at ECF No. 42, and close the case.

SO ORDERED.

Dated: September 28, 2020
      New York, New York

_____
ANALISA TORRES
United States District Judge